[60 NYS3d 454]

In the Matter of WILLIAM D. GOODMAN (Admitted as WILLIAM DAVID GOODMAN), an Attorney, Respondent. GRIEVANCE COMMITTEE FOR THE TENTH JUDICIAL DISTRICT, Petitioner.

Second Department, September 13, 2017

APPEARANCES OF COUNSEL

*Catherine A. Sheridan*, Hauppauge, for petitioner.
*Richard M. Maltz*, New York City, for respondent.

## OPINION OF THE COURT

Per Curiam.

The Grievance Committee for the Tenth Judicial District (hereinafter the petitioner) served the respondent with a petition containing four charges of professional misconduct. After a preliminary conference on March 4, 2016, and a hearing conducted on four days in June 2016, the Special Referee sustained all charges. The petitioner now moves to confirm the report of the Special Referee, and to impose such discipline upon the respondent as the Court deems appropriate. In opposition papers, the respondent, by counsel, seeks the dismissal of the charges. Alternatively, if the Court should sustain any of the charges, the respondent's counsel requests the imposition of, at most, a public censure.

Based upon the respondent's admissions, his sworn testimony, and the credible evidence adduced, we find that the relevant facts are as follows:

The underlying charges emanate from two real estate transactions involving property located in Brooklyn (hereinaf-

ter the Brooklyn property). In September 2005, the respondent represented David Dillon in his purchase of the Brooklyn property. The respondent is a licensed mortgage broker, and the principal owner of a mortgage brokerage company, Maric Capital Corp. (hereinafter Maric Capital), which operated from the same offices as his law practice in Great Neck. Maric Capital submitted two mortgage loan applications on behalf of Dillon, and secured a first mortgage loan in the sum of $440,000 from Downey Savings & Loan, and a line of credit mortgage loan in the sum of $200,000 from National City Bank.

On January 25, 2007, Downey Savings & Loan commenced foreclosure proceedings against Dillon, who sought counsel from attorney Sonia Tanksley. In or about March 2007, Tanksley contacted the respondent and requested the closing statement and documents relating to Dillon's purchase of the Brooklyn property. Tanksley made a second request for the closing documents, by facsimile to the respondent on March 26, 2007. Prior to receiving any documents from the respondent, on or about April 12, 2007, Dillon filed a grievance complaint against the respondent with the petitioner (hereinafter the Dillon complaint), which alleged, inter alia, as follows: that a person named Patrick Mullins solicited him to purchase the Brooklyn property, and referred him to Maric Capital for financing; that title to the Brooklyn property was to be held in Dillon's name for one year, after which Dillon would convey title to Mullins; that the respondent was the only attorney at the closing; that following the closing, Dillon discovered that he had become obligated on a first mortgage loan in an unspecified amount and a $200,000 equity line of credit, each secured by a mortgage on the Brooklyn property; that he had no knowledge of what happened to the mortgage proceeds, or who was paying the mortgage loan obligations for him following the closing; and that in or about August 2006, the respondent notified Dillon that the property and mortgages were now his sole responsibility. Further, Dillon claimed that, prior to filing his grievance complaint, he was contacted by National City Bank concerning the equity line of credit loan, and advised that it was investigating the circumstances surrounding that loan.

On or about April 23, 2007, the respondent advised Tanksley that he might have a buyer for the Brooklyn property. Kevin Lewis was the potential buyer. Lewis testified at the hearing that he had been approached by a coworker about an opportunity to make money in a real estate transaction that was

available to people who had good credit. At the time, Lewis was a 31-year-old college graduate, and was employed as a core driller helper. As the coworker explained to Lewis, he could use his good credit to purchase a house for someone who didn't have good credit. He would purchase the house in his name and hold it for one year, after which it would be transferred out of his name. He would be paid for his role in the transaction. The first proposed deal did not go through. Sometime in mid-April 2007, a man named Victor Guevera solicited Lewis to purchase the Brooklyn property from Dillon with the understanding that the mortgage payments would be made for him for approximately one year, and thereafter the house would be bought back. Lewis was promised $10,000 for his role in the transaction.

By letter dated April 30, 2007, the respondent was notified by the petitioner of the Dillon complaint, and was requested to provide his answer within 15 days. By letter dated May 17, 2007, the respondent requested and secured from the petitioner a three-week extension to submit his response to the Dillon complaint. Also, in or about mid-May 2007, the respondent notified Tanksley that he would not proceed with the sale to Lewis unless Dillon withdrew his grievance complaint.

Maric Capital submitted two mortgage loan applications on behalf of Lewis in May 2007. On May 15, 2007, a first mortgage loan in the sum of $582,000 was approved for Lewis by Countrywide Mortgage, and on May 25, 2007, a second purchase money mortgage loan in the sum of $300,000 was approved by National City Bank. A closing was set for June 1, 2007. However, shortly before the closing, Lewis changed his mind and had decided not to go through with the deal. After speaking with Mullins, who was Guevera's purported supervisor, and being assured that he would be represented by a lawyer and that his compensation would be increased to $15,000, Lewis agreed to proceed with the closing.

On the morning of June 1, 2007, the respondent met with Dillon and Tanksley at his law office to have Dillon execute, among other things, a deed and transfer documents conveying the Brooklyn property to Lewis. The respondent also received from Dillon general releases in favor of himself and Maric Capital, as well as a letter withdrawing his grievance complaint, which were all dated June 1, 2007.

The closing occurred in the afternoon of June 1, 2007, at the offices of the attorney for the lender, Rosalie Osias, who was

the respondent's wife, and whose offices were located in the same suite as the respondent's law office. The respondent represented Lewis, who signed documents obligating himself to pay $882,000 in mortgage debt. Records from the closing reveal that two different contracts were submitted to the lenders, reflecting different dates, and different contract prices. The contract of sale supporting the first mortgage loan given by Countrywide Mortgage is dated June 1, 2007, and reflects a sales price of $727,500. That sales price is also reflected on the U.S. Department of Housing and Urban Development form executed in relation to this loan, which was prepared by the lender's attorney, Osias. The Uniform Residential Mortgage Application dated June 1, 2007, which was submitted in relation to the $300,000 loan by National City Bank, indicates a purchase price of $995,000, as does a contract of sale dated April 5, 2007.

As the lender's attorney, Osias received net mortgage proceeds of $850,226.24 to disburse relating to Dillon's sale of the Brooklyn property to Lewis. From those proceeds, Osias disbursed $726,947.19 to satisfy Dillon's outstanding mortgages, home improvement loan, and closing costs. After paying fees and a commission to Maric Capital, legal fees to the respondent, $15,000 to Lewis, and making additional disbursements in connection with the closing, excess mortgage proceeds in the sum of $70,100 remained entrusted to Osias. At the closing, Lewis executed a letter authorizing Osias to disburse the excess mortgage proceeds to JSPOL Investors Corp. (hereinafter JSPOL), the respondent's property management and loan servicing company, for the purpose of making the monthly loan payments for Lewis on both loans.

By letter dated June 13, 2007, the respondent submitted an answer to the Dillon complaint, and enclosed therewith the letter from Dillon requesting that the complaint be withdrawn. In his response, the respondent, among other things, stated that he had been "shocked" by the Dillon complaint, and had met with Dillon and his attorney to discuss their concerns. Neither the respondent's answer to Dillon's complaint nor Dillon's withdrawal letter disclosed the recent sale of the Brooklyn property to the respondent's client, Lewis, or that the respondent had obtained the general releases from Dillon. In October 2007, the Dillon complaint was dismissed by the petitioner.

The respondent admitted that in transactions in which he represented a purchaser who had secured financing through

Maric Capital and Osias represented the lenders, any excess mortgage loan proceeds were paid monthly to the respondent by Osias, so that the monthly mortgage payments on the loans could be made by JSPOL. The respondent deposited the monthly payments from Osias into a checking account he maintained at Citibank for JSPOL, for which he was the sole signatory. Beginning in or about July 2007, the monthly checks the respondent received from Osias included funds on behalf of Lewis. Between July 2007 and September 2008, the respondent drew checks against the JSPOL checking account to make payments on Lewis's mortgage loans.

After the respondent stopped making payments for Lewis, National City Bank notified Lewis that the mortgage loan was in default, and that collection efforts were being undertaken against him. In late December 2008, Lewis filed a grievance complaint against the respondent with the petitioner. By letter dated January 2, 2009, the petitioner notified the respondent of the Lewis complaint. In his response to the Lewis complaint, the respondent denied any wrongdoing, and asserted, in essence, that it was he who had been duped by Lewis.

During the course of the petitioner's investigation of the Lewis complaint, the respondent was examined under oath on March 16, 2012. During his appearance, the respondent testified concerning his professional relationship with Osias and her role in Dillon's sale of the Brooklyn property to Lewis. The respondent testified that beginning in or about 1987, he and Osias became law partners in the firm of Goodman and Osias, and that the partnership lasted approximately five years. The respondent testified that, thereafter, he and Osias had continued to operate from the same office space, but had individual practices. When asked why they continued to share office space, the respondent testified that they "started out together. We've been successful. We stayed together." Later on, the respondent was asked if he was a married man, to which he replied "yes." Although not specifically asked, the respondent did not disclose to the petitioner that the attorney who represented the lenders, Osias, was his wife.

Charges one and two allege that the respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, conduct prejudicial to the administration of justice, and conduct adversely reflecting on his fitness as a lawyer, in connection with his written responses and by giving false or misleading testimony at an examination under oath, in rela-

tion to the petitioner's investigation of the complaints filed by Dillon and Lewis, in violation of former Code of Professional Responsibility DR 1-102 (a) (4), (5), and (7) (22 NYCRR 1200.3 [a] [4], [5], [7]), now rules 8.4 (c), (d), and (h) of the Rules of Professional Conduct (22 NYCRR 1200.0). Charge three alleges that the respondent improperly accepted and continued employment on behalf of clients in transactions in which he had conflicts of interest in that his exercise of professional judgment on behalf of his clients was affected by his own financial, business, property, or personal interests, and engaged thereby in conduct adversely reflecting on his fitness as a lawyer, in violation of former Code of Professional Responsibility DR 5-101 (a) and DR 1-102 (a) (7) (22 NYCRR 1200.20 [a]; 1200.3 [a] [7]), now rules 1.7 (a) (2) and 8.4 (h) of the Rules of Professional Conduct (22 NYCRR 1200.0). Charge four alleges that, by engaging in any or all of the aforesaid conduct, the respondent engaged in other conduct adversely reflecting on his fitness as a lawyer, in violation of former Code of Professional Responsibility DR 1-102 (a) (7) (22 NYCRR 1200.3 [a] [7]), now rule 8.4 (h) of the Rules of Professional Conduct (22 NYCRR 1200.0).

In view of the respondent's admissions and the credible evidence adduced at the hearing, we find that at the time that the respondent represented Lewis, he had multiple financial, business, and personal interests in ensuring that the Dillon sale closed, which conflicted with his exercise of professional judgment on behalf of his client, Lewis, in violation of former Code of Professional Responsibility DR 5-101 (a) (22 NYCRR 1200.20 [a]). The respondent testified at the hearing that, in view of his financial interest in Maric Capital, he recognized that he had a conflict of interest whenever he represented a client who used Maric Capital as their mortgage broker. The respondent further testified that it was his usual practice to disclose his dual interest to a client on the day of the closing, and have the client sign a document entitled "AFFILIATED BUSINESS DISCLOSURE AND REPRESENTATION WAIVER AGREEMENT" (hereinafter the waiver). In this case, the waiver the respondent obtained from Lewis on the day of the closing, among other things, indicated that Lewis was under no obligation to have the respondent represent him; that the respondent was an officer and director of Maric Capital and JSPOL; that Lewis requested the respondent to represent him; and that Lewis agreed to waive any and all potential conflict of interest

claims against the respondent, Maric Capital, or JSPOL. Notably, there is no indication in the waiver that the respondent fully disclosed to Lewis that the lenders were represented by his wife's firm, and the seller was the respondent's former client, who had a pending grievance complaint against him, and who was requested by the respondent to provide a letter withdrawing his complaint as well as general releases in favor of Maric Capital and the respondent upon the sale to Lewis. Moreover, we conclude that the respondent's multifaceted interests presented an inherent conflict of interest and a significant risk that his professional judgment would be adversely affected, such that no disinterested lawyer would conclude that his representation of Lewis would not be adversely affected thereby (*see Matter of Pine*, 194 AD2d 156 [1993]).

Further, we find that during the petitioner's investigation of the grievance complaints, the respondent's written responses and his testimony during an examination under oath were not fully candid, and were misleading. Indeed, we conclude that the respondent's response to the Dillon complaint was misleading inasmuch as it failed to disclose: (1) the recent sale of the Brooklyn property by Dillon to the respondent's client, Lewis, and (2) that he had requested Dillon to provide the letter withdrawing his grievance complaint, and general releases for Maric Capital and himself, as a condition for the respondent proceeding with the sale. As to the respondent's written response to the Lewis complaint, we find that the Special Referee correctly found that there was nothing to support the respondent's contention that he was, in essence, duped by Lewis. Additionally, during the respondent's testimony at the first examination under oath, while he was not specifically asked whether the attorney who represented the lenders, Osias, was his wife, we find that his responses, when placed in the context of an investigation involving potential conflicts of interests, lacked candor, were misleading, and reflected an effort to conceal yet another possible conflict of interest in the Lewis transaction.

In view of the respondent's admissions and the credible evidence adduced at the hearing, we find that the Special Referee properly sustained all charges. Accordingly, the petitioner's motion to confirm the Special Referee's report is granted.

In determining an appropriate sanction to impose, the respondent's counsel asks that the Court impose a public censure, taking into consideration, among other things, the following mitigating factors: the misconduct arises from an isolated

incident, which occurred nearly 10 years ago, and which will not be repeated; the evidence introduced regarding the respondent's character and reputation; and his unblemished record in 33 years of practice.

Under the totality of the circumstances, we find that the respondent's conduct warrants his suspension from the practice of law for a period of one year.

ENG, P.J., MASTRO, RIVERA, DILLON and BALKIN, JJ., concur.

Ordered that the petitioner's motion to confirm the Special Referee's report is granted; and it is further,

Ordered that the respondent, William D. Goodman, admitted as William David Goodman, is suspended from the practice of law for a period of one year, commencing October 13, 2017, and continuing until further order of this Court. The respondent shall not apply for reinstatement earlier than April 13, 2018. In such application (*see* 22 NYCRR 1240.16, 691.11), the respondent shall furnish satisfactory proof that during the period of suspension he: (1) refrained from practicing or attempting to practice law, (2) fully complied with this opinion and order and with the terms and provisions of the rules governing the conduct of disbarred or suspended attorneys (*see* 22 NYCRR 1240.15), (3) complied with the applicable continuing legal education requirements of 22 NYCRR 691.11 (a), and (4) otherwise properly conducted himself; and it is further,

Ordered that the respondent, William D. Goodman, admitted as William David Goodman, shall comply with the rules governing the conduct of disbarred or suspended attorneys (*see* 22 NYCRR 1240.15); and it is further,

Ordered that pursuant to Judiciary Law § 90, during the period of suspension and until further order of this Court, the respondent, William D. Goodman, admitted as William David Goodman, shall desist and refrain from (1) practicing law in any form, either as principal or agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, judge, justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,

Ordered that if the respondent, William D. Goodman, admitted as William David Goodman, has been issued a secure pass by the Office of Court Administration, it shall be returned forth-

with to the issuing agency, and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 1240.15 (f).